UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                Plaintiff,

v.

D-6 Avinash Thakkallapally,

                Defendant.

No. 19-20026-6

Hon. Gershwin A. Drain

**Offense:**
18 U.S.C. § 371
Conspiracy to commit visa fraud and
harbor aliens for profit

**Maximum Penalty:** Up to 5 years

**Maximum Fine:** $250,000

**Supervised Release:**
Up to 3 years

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

Defendant Avinash Thakkallapally is a foreign citizen who abused the student visa program so that he could remain and work in the United States illegally. Moreover, he and his co-conspirators recruited at least 600 foreign students to do the same. Thakkallapally is criminally responsible for the recruitment of over 100 students, 54 of which he personally recruited, and in return for his recruitment efforts, he received at least $15,000 in profits. Accordingly, the United States of America respectfully recommends that the Court impose a sentence between **37–46**

**months,** the sentencing guideline range calculated by the United States. Such a sentence is necessary in light of the seriousness of the offense, the need to punish Thakkallapally, deter Thakkallapally and others from committing the same misconduct, Thakkallapally's personal characteristics and to avoid unwarranted sentencing disparities.

## I.   BACKGROUND

Defendant Avinash Thakkallapally is a citizen of India who first traveled to the United States in 2015 on a temporary student visa known as an F-1 visa. (*PSR* ¶ 9). Before he could obtain his F-1 visa, Thakkallapally applied to study in the United States at a university through the Student and Exchange Visitor Program ("SEVP"), which is overseen by the Department of Homeland Security. (*Id.* at ¶ 10). Once accepted by a university—in this case Harrisburg University—the school issued a "Certificate of Eligibility for Nonimmigrant Student Status," better known as a Form I-20. (*Id.* at ¶ 10–11).

Thakkallapally's Form I-20 permitted him to enter the United States, (*PSR* ¶ 12), which he first did in 2015. (*Post Arrest Interview*). While in the United States, he used his Form I-20 for identification and proof of legal and academic status in the United States, and it also allowed for him to travel abroad and return to the United States. (*Id.* at ¶ 12). For his Form I-20 to remain valid, Thakkallapally knew that he needed to maintain his status as a full-time student "making progress toward

completion of [his] field of study," whether at his original school or any school to which he later transferred. (*Id.* at ¶ 13).

Thakkallapally's visa and Form I-20 also permitted him to participate in curricular practical training ("CPT"), which allowed him to find gainful employment as long as he continued to attend classes and make academic progress toward his degree. (*PSR* ¶ 15).

From February 2017 through January 2019, undercover agents from Homeland Security Investigations ("HSI") posed as employees of the University of Farmington ("the University"), located in Farmington Hills, Michigan. (*PSR* at ¶ 16-17). The University had no instructors, no classes, and no educational activities. Rather, it was a fictitious university used by foreign citizens as a "pay to stay" scheme. *Id.*   Under the "pay to stay" scheme, foreign citizens would enroll with the University as "students," but they would take no classes nor attend any educational programs. Instead, they would pay tuition so that the University would issue them Form I-20's that identified them as students making progress toward a degree, and if they desired, they could also seek gainful employment through the CPT program. *Id.*

On July 17, 2017, Thakkallapally contacted the University to discuss enrolling in the University without attending classes in order to fraudulently maintain his immigration status. Thakkallapally was told the arrangement was illegal and he

should use discretion when talking about the arrangement with others. Below is an excerpt of that conversation (AT = Avinash Thakkallapally, UC = Undercover Agent):

AT:    Actually my OPT going to expire next month, I would like to do second masters or CPT University of Farmington.

****

UC:    So, what have heard about us....What have you heard about our program here?

AT:    I didn't heard about any program just heard about a college.

UC:    So my question is are you planning on moving to Michigan?

AT:    No, I'd like to (unintelligible) online only.

UC:    You know we don't have just online courses.

UC:    Let me ask you another question. Are you….. looking to actually go to classes or are you just looking to just maintain your status?

AT:    I am just looking to maintain my status.

UC:    So you don't want to go to a class or anything like that?

AT:    Exactly.

UC:    Ok. Listen I can help you out but obviously, you know… this arrangement is not legal, you know?

AT:    Yeah.

UC:    You understand that? I mean I could bring you in with no classes…and give you Day 1 CPT but obviously it's not legal

so it has to stay between us. You know?

AT:   Yeah. I not tell to anybody.

UC:   Are you comfortable with that arrangement?

AT:   Yeah.

The following day, Thakkallapally called the University to discuss his application process and the enrollment period. He also asked the undercover agent about whether he could refer students to the University of Farmington in exchange for money:

AT:   So, do you accept any referrals?

UC:   What do you mean….oh, you want to refer people?

AT:   Yeah, there are lot of friends coming up.

UC:   Sure, why not. Just tell them that you sent them.

AT:   How much is the referral?

UC:   How many people can you bring in?

AT:   Uh…Five to ten.

UC:   Five to ten?

AT:   Yeah.

UC:   Um….I don't know, what are you thinking?

****

AT:   Right now there are two people, so that is the reason I am telling….

5

UC:   Well, we can talk about it, let me think about it.

During the conversation Thakkallapally proposed receiving $400 per student and mentioned that he had previously received $500 per student from Harrisburg University for referring students[1]. (*7/18/17 Recorded phone call*).   The undercover agent told Thakkallapally that he wanted to think about Thakkallapally's proposal and would discuss it with him in the future. In a September 28, 2017 phone conversation, Thakkallapally and the undercover agent agreed to a referral fee of $500 per student:

AT:   How about the referral?

UC:   What about the referral?

AT:   Ali, actually, you tell me that.

UC:   Right, right. What are you thinking?

****

UC:   Do you have a number in your head?

AT:   Yeah.

UC:   What's your number?

AT:   I tell you. In Harrisburg university, in each and every university, in NPU…. for one student its $500.

---

[1] While recruiting foreign students for a *legitimate* university is not illegal, doing so is a violation of Thakkallapally's F1 student visa which only permits him to work under a practical training program such as Optical Practical Training (OPT) or Curricular Practical Training (CPT).

UC:   Ok, I can do $500.

In the weeks and months that followed, Thakkallapally continued his recruitment efforts. There were days when Thakkallapally called the University repeatedly to request various actions be taken on behalf of his students.   In addition, Thakkallapally updated the agent on his recruiting efforts, asked for additional students to be admitted and inquired about payment for recruiting students. Below are examples of Thakkallapally's exhaustive involvement in the affairs of his students:

10/20/17    "I sent ██████████ photo and address      ….did you send student ID?"

10/30/17    "One guy, ██████████..I am going to send photo and offer letter.

11/6/17    "One more thing , my cousin needs acceptance ASAP…can I send it to you, can you give acceptance by today…is it ok if I get 15-20 people for January"

11/13/17    "Actually, one more thing…that money…Thanksgiving is coming and shopping IPhone XP….that money….anything arranged?"

On November 27, 2017, Thakkallapally and the undercover agent agreed to a sum of $5000 for recruiting 14 students and further agreed that the money would be wired by the undercover agent to Thakkallapally's bank account.   Below, Thakkallapally, under the alias "Vineth errabelli" emailed the University with his

banking information:

> **From:** Vinith errabelli
> **Sent:** Wednesday, December 13, 2017 1:04 PM
> **To:** ▮▮▮▮▮▮▮
> **Subject:** Wire transfer
>
> Hi ▮▮ plz find the details
>
> Chase bank
> Account number ▮▮▮▮▮▮▮▮▮
> Routing number: ▮▮▮▮▮▮▮▮

Four months later, undercover agents wired an additional $10,000 to Thakkallapally's Wells Fargo bank account, which represented payment for recruiting students to the University.

In total, this conspiracy recruited over 600 foreign students to the University of Farmington. (R.1: Indictment, 1). Thakkallapally personally recruited at least fifty four (54) students (*Exhibit 1*), and he also received cash payments of at least $15,000 from the University (*Id.* at ¶ 19).

Thakkallapally has pled guilty to conspiring to commit visa fraud (18 U.S.C. § 1546(a)) and harboring aliens for profit (8 U.S.C. § 1324) in violation of 18 U.S.C. § 371—without the benefit of a Rule 11 agreement, although the government did offer one. (*PSR*, ¶¶ 1, 4). Thakkallapally's co-conspirators are the foreign citizen "students" he recruited and his co-defendants. (*Id.* at ¶¶ 19, 21).

The maximum sentence for his offense is not more than five years' imprisonment, a maximum fine of $250,000, and an applicable term of supervised

up to three years. (*PSR* ¶¶ 53, 56, 61).

## II.   SENTENCING GUIDELINES CALCULATIONS AND § 3553(a) FACTORS

### Thakkallapally's Sentencing Guidelines

The government believes that Thakkallapally's total offense level is 21 and his criminal history category is I, which results in a guideline range of **37–46 months**. However, the government expects that the United States Probation Department will ultimately calculate the range at 24-30 months. The difference between Probation's guidelines and the government's guidelines are two-fold. First, the Probation Department only assessed 6 points under USSG § 2L1.1(b)(2)(B) as the defendant harbored between 25-99 unlawful aliens. Thakkallapally should be assessed 9 points as the conspiracy harbored over 600 unlawful aliens and he is responsible for acts of other conspirators that are reasonably foreseeable and within the scope of jointly undertaken criminal activity. Nonetheless, while the United States believes Thakkallapally's conduct is broad enough to include to conduct of his co-conspirators, the government will leave the scoring of this enhancement in the Court's discretion.

Second, the Probation Department only assessed 2 points under USSG § 3B1.1(c) finding that Thakkallapally was an organizer or leader. Because Thakkallapally managed and supervised the recruitment process of at least 93

unlawful aliens, Thakkallapally should be assessed 3 points under USSG § 3B1.1(b).

To qualify for a 3-point enhancement under USSG § 3B1.1(b), Thakkallapally must have a managed or supervised one or more of the participants and the criminal activity must have involved five or more participants or was otherwise extensive. USSG § 3B1.1(b); cmt. 2. "The burden of proving when the enhancement is appropriate is low: "'[T]here need only be evidence to support a finding that the defendant was a manager or supervisor of at least one other participant in the criminal activity....' "" *United States v. Beard*, 394 Fed. Appx. 200, 205 (6th Cir. 2010) (quoting *United States v. Henley,* 360 F.3d 509, 517 (6th Cir. 2004)). Control of subordinates is not necessary; Thakkallapally need only supervise or manage them. *United States v. Johnson*, 736 Fed. Appx. 568, 572 (6th Cir. 2018).

In determining the defendant's organizational role, and distinguishing between a leader and manager, Application Note 4 of § 3B1.1 identifies a number of non-exhaustive factors the Court can consider, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *See also United States v. Lalonde*, 509 F. 3d 750, 765-66 (6th Cir. 2007).

Here, Thakkallapally's 54 recruited students are undoubtedly participants in the criminal activity. Beyond recruiting these students to the University of Farmington in exchange for at least $15,000, Thakkallapally managed all of their paperwork, submitted the student's applications, received their acceptance letters, arranged their "start" date, requested deferrals on student's behalf, and facilitated the acceptance of fee receipts/SEVIS transfers.

Among many others, the emails below illustrate Thakkallapally's managerial role:

**From:** Vinith errabelli <vinni.rao9999@gmail.com>
**Sent:** Thursday, September 27, 2018 1:31 PM
**To:** studentaccounts@universityoffarmington.edu
**Subject:** Re: Outstanding Tuition Balance - Termination of Status

Hello ███ Gandam married to a US citizen, we can terminate his status right away.

---

**From:** Vinith errabelli
**To:** ████████
**Subject:** May intake last 4 applications
**Date:** Monday, April 23, 2018 9:07:28 AM
**Attachments:** ████████████████ UF Intl Application.pdf
████████████████.pdf
████████████.pdf
██████████.pdf

Hi ███, please find the attached last 4 applications for may intake, i will send the passport and visa copies to ████.



Thanks
Vin

**From:** Vinith errabelli
**To:** ███████
**Subject:** ████████████
**Date:** Monday, March 5, 2018 1:45:10 PM
**Attachments:** ████████Emp Letter.pdf

Hi Ali, please find the CPT employer letter and send me his i20.

Thanks
Vin

### The 3553(a) Factors

In determining an appropriate sentence, the Court should use the Sentencing Guidelines as a "starting point and the initial benchmark." *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Indeed, a sentence within the guidelines range carries a "rebuttable presumption of reasonableness." *United States v. Buchanan*, 449 F.3d 731, 734 (6th Cir. 2006). This is so because the guidelines "represent nearly two decades of considered judgment about the range of sentences appropriate for certain offenses." (*Id.* at 736) (Sutton, J., concurring). In particular, the guidelines aggregate the "sentencing experiences of individual judges, the administrative expertise of the [Sentencing] Commission, and the input of Congress…." *Id.*

Beyond the Guidelines, the Court should consider all of the factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. The § 3553(a) factors include:

(1) the nature and circumstances of the offense and the history and

characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and]
                ***
(6) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct….

18 U.S.C. § 3553(a).

Thakkallapally's conduct in this case demonstrates why a sentence within the guidelines is appropriate. Thakkallapally may suggest his role in committing fraud and harboring illegal aliens for profit stemmed from his attempt to help foreign national students obtain an education—including for some students who sought to transfer from schools that were in danger of losing their accreditation.[2] But his and his students' aims were not so noble.

Their true intent could not be clearer. While "enrolled" at the University, one

---

[2] These schools cater to "students" who want to exploit our foreign student education program. While they are the exception rather than the rule, unfortunately they do exist. Some of the "pay to stay" schools located around the United States that have been exposed over the years are: Prodee University; Neo-America Language School; Walter Jay M.D. Institute; the American College of Forensic Studies; Likie Fashion and Technology College; Tri-Valley University; Herguan University; the University of Northern Virginia; and the American College of Commerce and Technology.

hundred percent of the foreign citizen students <u>never</u> spent a single second in a classroom. If it were truly about obtaining an education, the University would not have been able to attract anyone, because it had no teachers, classes, or educational services. Instead, Thakkallapally and the foreign nationals he recruited wanted to commit a fraud upon the United States. At the outset, Thakkallapally informed his recruits there would be no classes and no education. The "students" willingly paid thousands of dollars to the undercover agents so that they could obtain fraudulent documents (Form I-20's) that would allow them to illegally stay, re-enter, and work in the United States.

But Thakkallapally's conduct was much more offensive than that of his recruits. Once he knew exactly what the University was—a fraud—he, not the University, raised the idea of recruiting other students who would be willing to commit fraud. He did so in order to make money. Specifically, in exchange for finding, enlisting, and managing all of the paperwork for others to illegally remain in the United States, he received more than $15,000 in profits. Hence, his illegal arrangement with the University proved to be quite profitable for him.

Therefore, Thakkallapally's conduct necessitates a guidelines sentence, and there are no legitimate reasons to vary below that range. (*PSR* ¶ 67.).   Nonetheless, under our immigration laws, Thakkallapally must be sentenced to at least 12 months in custody to permanently bar him from re-entering the United States. Such a bar is

certainly fitting in this case, since Thakkallapally intentionally exploited our student visa system for his own financial gain. He did so with the full knowledge that most of his recruits wanted to illegally enter the United States job market while unlawfully remaining in the United States. As a direct result of his actions, his recruited students—who were illegally working in the United States—deprived otherwise qualified individuals of employment or training opportunities.

## A.    Sentencing Reform Act factors

### 1.    Seriousness of the offense

Thakkallapally's decision to conspire to harbor aliens and commit visa fraud is a serious offense, as indicated by Congress's decision to authorize up to five years in prison for the offense. *See* 18 U.S.C. § 371; (PSR, ¶ 57). Specifically in this case, the F-1 student visa program is designed to promote and encourage foreign students to study at American institutions. (PSR, ¶ 9–16). Once they finish their course of study, the students must leave within 15 days. (*Id.* at ¶ 13). The idea is that the students return to their native countries to share their new knowledge and skills for the betterment of themselves and their country. Accordingly, the F-1 student visa program is not a naturalization program—i.e., it is not intended to be a path to obtaining U.S. citizenship.

If he receives a guidelines sentence, Thakkallapally will be deported once he serves his sentence, and he will be permanently barred from returning to the United

States in the future. And even without a permanent bar from a guidelines sentence, Thakkallapally will likely be deported, and there is no way to know whether he will return to the United States. Yet his likely deportation should not trigger a variance windfall.

The Sixth Circuit has been clear that 18 U.S.C. § 3553 requires that the defendant's sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014). Deportation is not part of the defendant's sentence. Many things that happen to a defendant following his conviction and sentence are "impermissible facts" in determining a sentence. *Id.* Things such as losing a professional license, paying legal fees, suffering embarrassment or a damaged reputation, or as is the case here, being deported, are not part of this Court's sentence.  "None of these things are [the defendant's] sentence. Nor are they consequences of his sentence," and a district court should therefore sentence the defendant "without considering these factors." *Id.*

Furthermore, Thakkallapally and his co-conspirators (his recruited students) ignored the purpose of the F-1 student visa program. In fact, Thakkallapally has remained in the United States since 2014, totaling over five years in the United States before he was arrested on January 31, 2019. (*Id.* at ¶ 4). During his time with the University, Thakkallapally illegally obtained employment and made approximately

$70,000 a year. (*Id.* at ¶ 51). Those jobs could have gone to U.S. citizens or to other foreign students who were lawfully in the United States on valid visas.

### 2.     Deterrence, protection of the public, and nature and circumstances of the offense

As noted above, Thakkallapally will likely be deported, and thus the likelihood of him re-engaging this same criminal conduct is highly unlikely. However, the Court's contemplation of §3553 factors regarding deterrence and protection of the public is not solely limited to whether the defendant is likely to be a recidivist. Rather, this Court is likewise required, in determining an appropriate sentence, to seek to deter others from committing such crimes and protect the public. This Court should do so in this instance. According to an SEVP summary issued by U.S. Immigration and Customs Enforcement in November 2016, 1.23 million foreign students were studying in the United States on student visas in 2016, and 8697 schools were certified to enroll international students.[3] A within guideline sentence for Thakkallapally would invariably serve as a warning and act as deterrence to any of the other one million other foreign students that are currently studying on student visas in the United States who may contemplate engaging in similar such conduct.

Additionally, this action and the related actions—19-cr-20024 and 19-cr-

---

[3] https://www.ice.gov/doclib/sevis/pdf/byTheNumbersDec2016.pdf (p.2).

20025—have garnered considerable media attention since the indictments were unsealed. Presumably, the sentences in this case and the related cases will also receive media focus. As a result, strong sentences against Thakkallapally and the other defendants would have a considerable chance of deterring other foreign students—and some schools—from abusing the F-1 student visa program. In addition, as indicated by the success Thakkallapally and the other defendants had in recruiting students to the University, their vast network of students and potential students, at the very least, could be deterred by a sentence with within the sentencing guidelines.

In light of the above, a deterrent prison sentence between 37 and 46 months is appropriate.

### 3.    Characteristics of the defendant

Thakkallapally indicated he has a loving and supportive family in India. (*PSR*, ¶ 41-43). He further indicated that he suffers from chronic asthma and was previously hospitalized in India for the condition. (*Id*. at 46).   He attended a Junior College university in India and pursued a Master's degree from Northwestern Polytechnic University in computer science. (*Id*. at 49). Thus, he has received support, love, and opportunities that many defendants who appear before this Court have not, and yet he still chose to commit the instant offense. As a result, Thakkallapally's personal characteristics counsel that a guideline sentence is

appropriate.

### 4.    Need to avoid sentencing disparities

The Supreme Court reiterated in *Booker* that reducing sentencing disparities was Congress's basis statutory goal in passing the Federal Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 250, 264 (2005). Thus, calculating and analyzing the guidelines is the primary driver in avoiding unwanted sentencing disparities. *Id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). Indeed, by correctly calculating and considering the Sentencing Guidelines, the Court automatically gives "significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). A variance in this matter would result in unwanted sentencing disparities.

Furthermore, a variance based on deportation would be contrary to the dictates of 18 U.S.C. § 3553 (2)(A) which requires that the defendant's sentence reflect the seriousness of the offense (see above). By allowing the Court to consider deportation as grounds for a downward variance for illegally harboring aliens, it would invariably grant the Court the authority to vary for an alien yet bar similar such consideration for an equally culpable defendant, who happens to be a U.S. citizen, and not subject to deportation. In essence, it would reward an alien while punishing a United States citizen for committing the exact same offense. This is universally

unfair and would likewise run afoul of 18 U.S.C. Section 3553(a)(6) which mandates that the Court's sentence should "… avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Here, Thakkallapally sought to abuse the student visa program so that he could remain and work in the United States illegally. While illegally present in the United States he chose to line his own pockets when he proposed illegally making money by managing, harboring and recruiting other foreign students to do the same.   In return for his recruitment efforts, he received more than $15,000 in profit.   Such calculated criminal acts do not warrant a downward variance.

Therefore, this factor favors a sentence within the guidelines. However, the Court should also be mindful of the five other recruiters charged in this case, along with the two recruiters charged in related cases, 19-cr-20024 and 19-cr-20025. Naveen Prathipati, who recruited less than twenty students, received a sentence of 12 months and a day, Bharath Kakireddy and Suresh Kandala, received a sentence of 18 months.   Thakkallapally, like Kandala, helped enlist hundreds of foreign citizens to enroll at the University with the goal of fraudulently maintaining their status in the United States.

## III.    CONCLUSION

For the reasons stated above, the government recommends this Court

sentence Thakkallapally within the sentencing guideline range.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/ Timothy P. McDonald*
Timothy P. McDonald
Ronald W. Waterstreet
Brandon C. Helms
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI   48226
Phone: (313) 226.9100
Email: Ronald.Waterstreet@usdoj.gov
Email: Timothy. McDonald@usdoj.gov
Email: Brandon.Helms@usdoj.gov

Dated: September 5, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 5, 2019, I electronically filed the

foregoing paper with the Clerk of the Court using the ECF system, which will

provide notification to all counsel of record.


<u>*/s/Timothy P. McDonald*</u>
Timothy P. McDonald
Assistant United States Attorney

22